# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

KISHA SIMON,               )
                                     )
                Plaintiff,      )
                                     )
        v.                    )     Civil Action No. 17-2033 (RBW)
                                     )
COMMISSIONER OF SOCIAL    )
SECURITY,                   )
                                     )
                Defendant.    )

---

## MEMORANDUM OPINION

The plaintiff, Kisha Simon, brings this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c), against the defendant, the Commissioner of Social Security, seeking judicial review of the decision by an administrative law judge ("ALJ") denying her application for disability insurance benefits and supplemental social security income.  See Complaint ("Compl.") ¶¶ 1–2. Currently pending before the Court are the plaintiff's motion for judgment of reversal, see Motion for Judgment of Reversal ("Pl.'s Mot."), ECF No. 11, and the defendant's motion for judgment of affirmance, see Defendant's Motion for Judgment of Affirmance and in Opposition to Plaintiff's Motion for Judgment of Reversal ("Def.'s Mot."), ECF No. 12.  Upon careful consideration of the parties' submissions,[1] the Court concludes for the following reasons that it must grant the plaintiff's motion, deny the defendant's motion, reverse the ALJ's decision, and remand the case to the agency for further proceedings.

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Memorandum of Points and Authorities in Support of Plaintiff's Motion for Judgment of Reversal ("Pl.'s Mem."), ECF No. 11-1; (2) the Defendant's Memorandum in Support of Her Motion for Judgment of Affirmance and in Opposition to Plaintiff's Motion for Judgment of Reversal ("Def.'s Mem."), ECF No. 13; (3) the Plaintiff's Response to Motion for Judgment of Affirmance and Reply to Motion for Judgment of Reversal ("Pl.'s Reply"), ECF No. 14; and (4) the administrative record ("App."), ECF Nos. 9-1 to 9-12.

# I.     BACKGROUND

## A.     Statutory and Regulatory Framework

Pursuant to the Social Security Act (the "Act"), an individual is entitled to disability benefits if he or she is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months[.]

42 U.S.C. § 423(d)(1)(A).  To determine whether a claimant is entitled to benefits, an ALJ "gathers evidence, holds a hearing, [and] takes testimony," which may include testimony by a vocational expert.  Kim M. v. Kijakazi, Civil Action No. 20-cv-2072 (GMH), 2021 WL 4033060 (D.D.C. Sept. 3, 2021).  The ALJ then "performs [a] five-step, sequential inquiry of the [claimant's] disability claim[,]" as set forth in 20 C.F.R. § 404.1520.  Id.

> First, the claimant must show that [he or] she is not presently engaged in "substantial gainful activity."  20 C.F.R. § 416.920(a)(4)(i).  Second, [he or] she must demonstrate that [he or] she has a "severe impairment" that "significantly limits [his or her] physical or mental ability to do basic work activities."  20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c).  Third, the claimant must show that [his or] her impairments or combination of impairments "meets or equals" one of the listings at 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 416.920(a)(4)(iii).  If they do, then the claimant is deemed disabled, and the inquiry ends.  Id.  If not, the ALJ must proceed to the fourth step, which requires the ALJ to determine the claimant's residual functional capacity and consider whether, in light of that capacity, the claimant can still perform work that [he or] she has done within the past [fifteen] years (if the claimant has indeed done such work).  See 20 C.F.R. §§ 416.920(a)(4)(iv), 416.960(b)(1).  Fifth, if the claimant's capacity indicates that [he or] she cannot engage in past work, then the burden shifts to the [agency] to prove that the claimant's capacity, age, education, and past work experience indicate that [he or] she is able to perform "other work" that exists in the national economy.  20 C.F.R. § 416.920(a)(4)(v); Butler, 353 F.3d at 997.

Mitchell v. Kijakazi, No. 19-cv-2560 (DLF), 2021 WL 5310541, at *2 (D.D.C. Nov. 15, 2021). "Through the first four steps of this inquiry, the claimant bears the burden of proof[,]" however,

at step five, "the burden shifts to the [agency] to identify specific jobs sufficiently available in the national economy that the claimant can perform." Callahan v. Astrue, 786 F. Supp. 2d 87, 89 (D.D.C. 2011).

**B.     The Plaintiff's Disability Claims and Procedural History**

This case concerns two applications filed by the plaintiff: (1) an application under Title II and Part A of Title XVIII for a period of disability and disability insurance benefits, filed on August 16, 2013, see App. at 212–15, and (2) an application under Title XVI and Title XIX for supplemental security income, filed on September 24, 2013, see id. at 216–24. Both applications alleged that the plaintiff became disabled as of September 1, 2009. See id. at 212, 216.

The plaintiff's applications were initially denied by the defendant on January 29, 2014. See id. at 137–43 (notifying the plaintiff of the denial of her applications). On February 5, 2014, the plaintiff requested reconsideration of the defendant's decision, see id. at 148, and on February 24, 2014, the defendant determined that "the previous determination denying [the plaintiff's] claim[s] was proper under the law[,]" id. at 158; see id. at 149–60 (notifying the plaintiff of the agency's determination that its previous denials were proper).

On April 8, 2014, the plaintiff submitted a "request for [a] hearing by" an ALJ. Id. at 161. In support of her applications, the plaintiff submitted to the ALJ the medical documentation that had been previously considered by the agency, as well as additional documentation that post-dated the agency's determinations.[2]

---

[2] This information is compiled in the administrative record submitted in this case. See App. at 252–60 (function report dated September 27, 2013, completed by the plaintiff); id. at 261–71 (third-party function report dated September 27, 2013, completed by Sequitta Tolliver, the plaintiff's friend); id. at 313–22 (treatment records dated July 28, 2006, to August 18, 2006, from Dr. Alfred C. Burris); id. at 323–427 (Charter Family Health Center PC hospital records dated March 30, 2001, to September 25, 2006); id. at 428–41 (disability consultation records dated November 17, 2006, from Dr. Elliot Aleskow); id. at 442–51 (Fort Washington Medical Center emergency department records dated August 31, 2009); id. at 452–54 (Prince George's Hospital Center operative report dated August 25, 2010); id. at 455–88 (treatment records dated February 18, 2010, to June 24, 2013, from Dr. Joel L.

(continued . . .)

On February 22, 2016, the ALJ held a hearing regarding the plaintiff's applications, see id. at 41, at which the plaintiff, see id. at 51–66, and a vocational expert, Dr. James M. Ryan, see id. at 66–72, testified.  The plaintiff stated that, prior to filing her applications, she worked as a cashier at a Giant Food grocery store for "[a] little over two years[.]"  Id. at 53.  While performing her cashier duties on August 31, 2009, see id. at 310, her "forearm . . . [got] caught in the conveyor belt[,]" "pinch[ing]" her "nerve[,]" resulting in her going "to the emergency room straight after work."  Id. at 55.  The plaintiff underwent two surgeries related to this injury, resulting in ongoing pain.  See id.; see also id. at 310 (noting that the plaintiff had "an anterior cervical discectomy, an[] interbody fusion, and an anterior instrumentation procedure done at C6–7 . . . by Dr. Falik" on August 25, 2010, and "had the C6–7 fusion redone by Dr. [ ] Aulisi" on July 3, 2014).  The plaintiff stated that, because of the injury, she did not "have good strength in [her] hand[,]" was "not able to do multiple rotations with the arm[,]" and was "not able to lift as much . . . on [her] left [side] as [she was able to lift] on [her] right[ side]."  Id. at 56.  The plaintiff also reported having issues with bending and squatting because, while she waited for her first surgery, "the vertebra[e] of [her] spinal cord [were] being pushed from [her] cervical . . . discs."  Id. at 57.  However, the plaintiff noted that she does not use a "cane or anything to get

---

(. . . continued)

Falik); id. at 489–93 (medical questionnaire dated September 30, 2013, completed by Dr. Nora Bammidi); id. at 494–501 (consultative examination records dated November 26, 2013, from Dr. Joel Taubin); id. at 502–03 (treatment records dated February 3, 2014, from Dr. Bammidi); id. at 504–15 (treatment records dated February 6, 2013, to October 23, 2013, from Dr. Michael A. Frenchetti); id. at 516–28 (treatment records dated June 6, 2014, to September 23, 2015, from Dr. Edward Aulisi); id. at 529–76 (treatment records dated July 3, 2014, to October 23, 2015, from Dr. Lee Ann Rhodes); id. at 577–86 (Medstar Washington Hospital Center records dated July 13, 2012, to September 7, 2012); id. at 587–644 (Civista Hospital records dated January 8, 2012, to September 1, 2013); id. at 645–802 (United Medical Center Hospital records dated August 20, 2012, to August 11, 2015); id. at 803–04 (Medstar Washington Hospital Center records dated October 23, 2015); id. at 805–900 (Unity Health Care treatment records dated February 5, 2014, to January 28, 2016); id. at 901–06 (mental residual functional capacity assessment dated February 9, 2016, by physician assistant Alexandra Scheer); id. at 907–39 (Rehabilitation Center of Southern Maryland physical and occupational therapy records dated January 21, 2011 to July 20, 2011); id. at 940–42 (Georgetown University Hospital radiology report dated September 3, 2013); id. at 943–50 (Multi Specialty Health Care records dated January 26, 2016, to February 12, 2016).

around" and, although she had "a back brace[,]" she did not "wear it." Id.  The plaintiff further

stated that her "pain [ ] get[s] worse" when she is doing activities like "[h]ousehold cleaning[ or]

laundry" because of the "constant movement" and "things that consist of [her] moving that

repeatedly." Id. at 61.  However, she stated that she could walk "with breaks" for "maybe an

hour without pain[,]" and "constant[ly] stand in one spot[ for ]roughly [fifteen or twenty]

minutes." Id.  She also reported that "sitting for a prolonged period of time affect[ed her] pain"

and that she could sit for "maybe an hour, hour and a half tops." Id. at 61–62.  Finally, the

plaintiff stated that "maybe five, six" days per month she had to "lay down during the day" for

approximately two to three hours "because [her] pain ha[d] been exacerbated." Id. at 62–63.

Although the plaintiff had looked for work as a "reception[ist], [in] security, [or as a] bank

teller[,]" id. at 54, she represented that she had not secured work since her employment with

Giant Food ended, see id. at 53.

Regarding her mental health, the plaintiff reported that she "had trouble sleeping"

because "of nightmares of fearful things, violent things[,]" id. at 59, and was falling back into a

depression "where [she] pushed away friends and family, stayed to [her]self, [and had] a lot of

isolation[ and] no outside communication of [any] kind[,]" id. at 63.  She said that the depression

was worsened by her pain, see id. at 64 ("On my worst days, when I'm in the most pain, I sit

around and I cry, and I think of things to do"), and also by the end of her employment at Giant

Food, see id. at 65, and caused her to be "[un]able to focus . . . and not being able to function,

[such] that [she was] not able to do [her] daily activities[,]" id. at 63–64.  The plaintiff also

reported having hallucinations "at points[,]" where she would "see someone maybe standing

down the hall, or walking from the room to the bathroom or so." Id. at 65.

On May 2, 2016, the ALJ issued his decision, concluding that the plaintiff was not entitled to benefits.  See id. at 24.  Regarding the first three steps under § 404.1520, the ALJ concluded that (1) the plaintiff "has not engaged in substantial gainful activity since September 1, 2009," and (2) she "has the following severe impairments: cervical and lumbar disc disease, cervical radiculitis, pseudoarthrosis, a chronic lumbar strain, dysfunction of a major joint (shoulder), chronic pain syndrome, asthma, a major depressive disorder, an anxiety disorder[,] [ ] and a posttraumatic stress disorder[,]" but (3) she "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926.  Id. at 13.

Regarding the fourth and fifth steps, which address the plaintiff's "residual functional capacity[,]" including both physical and mental residual functional capacity,[3] the ALJ concluded that the plaintiff

> has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [she] can occasionally lift and/or carry [twenty-five] pounds and frequently lift and/or carry [ten] pounds.  In addition, [she] can stand or walk for a total of six hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday.  [She] can also push or pull as much as she can lift and/or carry, including the use of hand and/or foot controls, but can only occasionally use hand controls.  Moreover, [she] has no limits on balancing and climbing of ramps and stairs, but can never crawl or climb ladders, ropes[,] and scaffolds.  [She] can occasionally stoop, kneel, crouch[,] and use the nondominant hand for handling and fingering with no such limits on the dominant hand.  [She] can also occasionally use the nondominant arm for reaching in all directions with no such limit on the dominant arm.  [She] can also have frequent exposure to fumes, odors, dusts, gasses[,] and poor ventilation.  [She] can constantly understand, remember[,] and carry out instructions concerning simple tasks[,] and can occasionally understand, remember[,] and

---

[3] Because the plaintiff "does not contest the ALJ's physical [residual functional capacity] findings[,]" Pl.'s Mem. at 4 n.1, the parties and the Court focus solely on the ALJ's mental residual functional capacity determination.  See id.; Def.'s Mem. at 2 n.1 (noting that the "[p]laintiff's [residual functional capacity] argument focuses only on her mental health" and that the "[d]efendant's discussion of the evidence and [residual functional capacity] argument is tailored accordingly").

carry out instructions concerning detailed tasks. Finally, [she] can constantly make simple decisions and can occasionally make detailed decisions.

Id. at 16. Although the ALJ concluded that the plaintiff "would be unable to perform her past relevant work[,]" id., he concluded that "[e]vidence does exist that demonstrates that other work exists in significant numbers in the national economy that the [plaintiff] can do, given [her] residual functional capacity, age, education, and work experience[,]" id. at 23–24. Therefore, he determined that the plaintiff "failed to meet her burden of establishing that she is disabled." Id. at 24.

## II.    STANDARD OF REVIEW

Under the Act, a claimant may seek judicial review of an ALJ's decision by a federal district court. See 42 U.S.C. § 405(g). A district court has discretion "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the case for a rehearing." Faison v. Colvin, 187 F. Supp. 3d 190, 193 (D.D.C. 2016) (internal quotation marks omitted). However, the "district court's review of the [ALJ's] findings of fact is limited to whether those findings are supported by substantial evidence[,]" Dunham v. Astrue, 603 F. Supp. 2d 13, 17 (D.D.C. 2012), meaning such relevant evidence as "a reasonable mind might accept as adequate to support a conclusion[,]" Butler v. Barnhart, 353 F.3d 992, 999 (D.C. Cir. 2004). This standard "requires more than a scintilla, but can be satisfied by something less than a preponderance of evidence[,]" id. (internal quotation marks omitted), and "is highly deferential to the agency fact-finder[,]" Jeffries v. Astrue, 723 F. Supp. 2d 185, 189 (D.D.C. 2010) (internal quotation marks omitted). However, the ALJ must "ha[ve] analyzed all evidence and [ ] sufficiently explained the weight he [or she] has given to obviously probative exhibits." Lane-Rauth v. Barnhart, 437 F. Supp. 2d 63, 65 (D.D.C. 2006) (internal quotation marks omitted). The plaintiff "bears the burden of

demonstrating that the [ALJ's] decision [was] not based on substantial evidence or that incorrect legal standards were applied."  Cooper v. Berryhill, Civ. Action No. 16-1671, 2017 WL 4326388, at *3 (D.D.C. Sept. 28, 2017) (internal quotation marks omitted).

### III.    ANALYSIS

The plaintiff argues that the Court should remand this case to the ALJ because (1) "the ALJ failed to reconcile a conflict between the vocational expert's testimony and the Selected Characteristics of Occupations[,]"[4] and (2) "the ALJ's mental [residual functional capacity determination] was not supported by substantial evidence."  Pl.'s Mem. at 4.  In response, the defendant argues that (1) the vocational expert's "testimony was consistent with the [Dictionary of Occupational Titles] and [the Selected Characteristics of Occupations], except regarding whether the hypothetical person with upper extremity limitations could perform the identified jobs, which [the vocational expert] based on his [forty] years of experience in the field[,]" and (2) "substantial evidence supported [the ALJ's mental residual functional capacity] determination."  Def.'s Mem. at 1–2.  For the following reasons, the Court agrees with the plaintiff that remand is required because (1) the ALJ failed to reconcile the conflict between the vocational expert's testimony and the Selected Characteristics of Occupations, and (2) the ALJ failed to provide a sufficient explanation for his reasons for disregarding mental health treatment records proffered by the plaintiff.

---

[4] The Selected Characteristics of Occupations is a supplement to the Dictionary of Occupational Titles, which "is a compendium of 'standardized occupational information' that provides a brief description of occupations within the national economy and lists the capabilities that each occupation requires of a worker."  Callahan v. Astrue, 786 F. Supp. 2d 87, 90 (D.D.C. 2011).  The Selected Characteristics of Occupations provides "a shorthand listing of the functional requirements of each job."  2 Paul M. Ryther & Barbara Samuels, Social Security Disability Claims Practice & Procedure § 22:159 (2d ed. 2021).

**A.** **The Plaintiff's Argument that the ALJ Failed to Reconcile a Conflict Between the Vocational Expert's Testimony and the Selected Characteristics of Occupations**

First, the plaintiff argues that "the ALJ erred . . . by failing to resolve [a] conflict" between the Selected Characteristics of Occupations and the "vocational expert's testimony that [the] jobs [of packer/packaging worker, grader/sorter, and laundry worker] were available [to the plaintiff] despite [her] need to be limited to occasional hand controls[] and occasional use of [her] non-dominant arm for handling, fingering, or reaching."  Pl.'s Mem. at 14.  In response, the defendant argues that the vocational expert's "testimony was properly supported by his [forty] years of professional experience" and the "ALJ elicited a reasonable explanation from the [vocational expert] for the conflict[;]" "[t]herefore, substantial evidence supports the ALJ's determination that there were sufficient jobs in the national economy that [the p]laintiff could perform despite her limitations."  Def.'s Mem. at 10–11.  For the following reasons, the Court agrees with the plaintiff that the ALJ failed to properly resolve the conflict.[5]

---

[5] Although the defendant does not dispute the existence of a conflict between the vocational expert's testimony and the Selected Characteristics of Occupations, see Def.'s Mem. at 10 (arguing that "the ALJ elicited a reasonable explanation from [the vocational expert] for the conflict"); see generally id. (providing no argument that a conflict does not exist), the Court notes the conflict here for clarity.

During the hearing, the ALJ asked the vocational expert to consider a hypothetical individual with "the same age, education[,] and work experience as the [plaintiff]" and "a high school education based on the GED [she] obtained."  App. at 67–68.  This hypothetical individual

> can occasionally lift and[/]or carry [twenty-five] pounds, frequently lift and[/]or carry [ten] pounds[, and c]ould stand and[/]or walk for a total of six hours in an eight[-]hour workday.

> [The individual could s]it for a total of six hours in an eight[-]hour workday[ and c]an push and[/]or pull as much as [he or she] can lift and[/]or carry[,] . . . [which] includes the operation of hand and[/]or foot controls.  But this [ ] hypothetical individual can only occasionally use hand controls.

> The hypothetical individual has no limits on climbing ramps or stairs, but can never climb ladders, ropes[,] or scaffolds.  No limits on balancing, but only occasionally stoop, occasionally kneel, occasional[ly] crouch, and can never crawl. . . . The hypothetical individual can occasionally use the non-dominant hand for handling[ and o]ccasionally use the non-dominant hand for fingering.  There[ are] no such limitations on the dominant hand.

(continued . . .)

Conflicts between a vocational expert's testimony and the Dictionary of Occupational

Titles or the Selected Characteristics of Occupations are governed by Social Security

Ruling 00-4p ("SSR 00-4p").  See SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000).  Under

SSR 00-4p, "[w]hen there is an apparent unresolved conflict between [a vocational expert's]

---

(. . . continued)

> The hypothetical individual can only occasionally use the non-dominant arm for reaching in all directions[ but t]here[ is] no such limitation on the dominant arm.  The hypothetical individual can have only frequent exposure to fumes, odors, dust, gases[,] and poor ventilation.
>
> This hypothetical individual retains the ability to understand, remember[,] and carry out instructions concerning simple tasks on a constant basis[, but r]etains the ability to understand, remember[,] and carry out instructions concerning detailed tasks only occasionally.
>
> The hypothetical individual retains the ability to make simple decisions constantly, and detailed decisions only occasionally[] . . . [and] retains the ability to interact with the public occasionally.
>
> There[ is] no limitation on interacting with supervisors or co-workers.

Id. at 67–69 (emphasis added).  The vocational expert testified that this hypothetical individual would be able to perform at least three unskilled jobs, specifically "packer and packaging worker[,]" "grading and sorting worker[,]" and "laundry worker." Id. at 69–70.  The ALJ then asked the vocational expert to consider a different hypothetical individual who could

> frequently lift and[/]or carry [ten] pounds[, s]tand and[/]or walk for a total of four hours in an eight[-]hour workday[,] [ ] sit for a total of six hours in an eight[-]hour workday[,] [ ] push and[/]or pull[,] including the operation of hand and[/]or foot controls[,] as much as they can lift and [/]or carry[, but] . . . can only occasionally use hand controls[.]"

Id. at 70–71 (emphasis added).  In response, the vocational expert testified that the same positions "would remain[,]" but, "with the additional limitation to the standing, there would be an additional [ten] percent erosion in the number [of available jobs] that exist in the national economy." Id. at 71.

As the plaintiff correctly notes, see Pl.'s Mem. at 15, there is "an apparent unresolved conflict[,]" SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000), between this testimony and the requirements of being a packer and packaging worker (DOT#: 222.687-022), grading and sorting worker (DOT#: 649.687-010), and laundry worker (DOT#: 302.685-010), as reflected in the Selected Characteristics of Occupations.  See Pl.'s Mem. at 15.  According to the Selected Characteristics of Occupations, the job of packer and packaging worker requires frequent handling, reaching, and fingering, see U.S. Dep't of Labor, Dictionary of Occupational Titles, DICOT 222.687-022, 1991 WL 672133 (4th ed. 1991); the job of grading and sorting worker requires frequent handling, reaching, and fingering, see DICOT 649.687-010, 1991 WL 685669 (4th ed. 1991); and the job of laundry worker requires constant reaching and handling, and occasional fingering, see DICOT 302.685-010, 1991 WL 672657 (4th ed. 1991).  However, as the defendant notes, both of the ALJ's hypothetical individuals had "upper extremity limitations[,]" see Def.'s Mem. at 10, which meant that they could only occasionally use their non-dominant arms for handling, reaching, and fingering, see App. at 68, or only occasionally use hand controls, see id. at 71.  Accordingly, because "frequent" and "constant" work require more exertion than "occasional" work, see SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983) (defining "occasionally" as "occurring from very little up to one-third of the time" but defining "frequent" as "occurring from one-third to two-thirds of the time"), the Selected Characteristics of Occupations' definition of these three job positions conflicts with the vocational expert's testimony that the hypothetical individuals in the ALJ's questions would be able to perform these jobs.

evidence and the [Dictionary of Occupational Titles], the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert's] evidence to support a determination or decision about whether the claimant is disabled."  Id. at *2.  "The adjudicator [then] must resolve the conflict by determining if the explanation given by the [vocational expert] is reasonable and provides a basis for relying on the [vocational expert's] testimony[,] rather than on the [Dictionary of Occupational Titles'] information."  Id.  The adjudicator must "explain in the determination or decision how he or she resolved the conflict."  Id. at *4.

During the hearing, the ALJ asked the vocational expert whether "the testimony [he had] given [at the hearing was] consistent with the information found in the Dictionary of Occupational Titles and the companion publication [that the ALJ had] mentioned earlier[,]" namely, the Selected Characteristics of Occupations.[6]  App. at 72.  In response, the vocational expert stated:

> [M]y testimony is consistent with the Dictionary of Occupational Titles. Addressing – with the additions, addressing issues such as [the] use of hand controls with one or both upper limbs, and limitations to the upper limbs, as well as interaction with other individual[s] or the general public.  These items are not covered by the Dictionary of Occupational Titles.[7]  My response is based on [forty] years [of] experience as a vocational consultant.

---

[6] Although the ALJ did not specifically refer to the Selected Characteristics of Occupations when he asked this question, he earlier referred to the Dictionary of Occupational Titles and the Selected Characteristics of Occupations collectively when asking the vocational expert to "advise" the ALJ and the parties "if [he were to] give [ ] an opinion which conflicts with the information in the Dictionary of Occupational Titles, and the Selected Characteristics of Occupations, defined in the revised Dictionary of Occupational Titles," App. at 66–67.  Therefore, the Court concludes that the Selected Characteristics of Occupations is the "companion publication[,]" id. at 72, to which the ALJ was referring here.

[7] The Court notes that the vocational expert testified that the "issues such as [the] use of hand controls with one or both upper limbs, and limitations to the upper limbs, as well as interaction with other individual[s] or the general public[,] . . . are not covered by the Dictionary of Occupational Titles[,]" App. at 72, which suggests that the vocational expert perceived an omission in the Dictionary of Occupational Titles that he was able to fill with his "[forty] years [of] experience as a vocational consultant[,]" id., as opposed to a conflict between his opinion and the Dictionary of Occupational Titles.  However, regardless of whether the issues identified by the vocational expert in his testimony are the same as the conflict identified by the plaintiff between the Selected Characteristics of Occupations and the vocational expert's testimony, such a conflict does exist, see supra n.5, at 9–10, and the ALJ had an independent duty to resolve the conflict even if the vocational expert did not identify it, see Carpenter v. Colvin, Case No. 1:13-cv-01637 (CKK/GMH), 2016 WL 946975, at *6 (D.D.C. Feb. 24, 2016) ("SSR 00-4p should

(continued . . .)

Id.  The vocational expert provided no further explanation as to how his "[forty] years [of] experience as a vocational consultant" provided the basis for resolving the inconsistencies that he identified, id.; see also id. at 66–72, and the ALJ did not ask any clarifying questions, see generally id.

Despite SSR 00-4p's requirement that "[t]he adjudicator must explain the resolution of the conflict[,]" 2000 WL 1898704, at *4, the ALJ's decision neither identifies the existence of a conflict nor provides any explanation of how the conflict was resolved.  See generally App. at 10–24.  Rather, the ALJ states:

> [T]he [ALJ] asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that[,] given all of these factors[,] the individual would be able to perform the requirements of representative occupations such as a packer/packaging worker [ ] with 48,000 jobs nationally, a grader/sorter [ ] with 51,000 jobs nationally[,] and a laundry worker [ ] with 36,000 jobs nationally.
>
> Pursuant to SSR 00-4p, the [ALJ] has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.  Accordingly, the limited burden of going forward with the evidence that shifted to [the defendant] at step five of the evaluation process is satisfied.  Evidence does exist that demonstrates that other work exists in significant numbers in the national economy that the [plaintiff] can do, given [her] residual functional capacity, age, education, and work experience[.]
>
> The [ALJ] concludes that, considering the [plaintiff's] age, education, work experience, residual functional capacity, and all the other evidence of record, including the testimony of the claimant and the vocational expert, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

---

(. . . continued)
not be read as limiting the ALJ's duty to identify and resolve such conflicts only to those conflicts that are, in some way, made obvious to the ALJ either by the [vocational expert] or the claimant's counsel during the administrative hearing").

Id. at 23–24 (emphasis added).  Accordingly, the ALJ concluded that "the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles[,]" id. at 23, despite the conflict between the Selected Characteristics of Occupations' characterization of the requisite level of handling, fingering, and reaching for these positions, and the hypothetical individuals' abilities, compare U.S. Dep't of Labor, Dictionary of Occupational Titles, DICOT 222.687-022, 1991 WL 672133 (4th ed. 1991); DICOT 649.687-010, 1991 WL 685669 (4th ed. 1991); DICOT 302.685-010, 1991 WL 672657 (4th ed. 1991), with App. at 67–71.

The defendant raises several arguments in response.  First, the defendant urges the Court to conclude that "[w]hat the ALJ wrote[ ] was that the [vocational expert's] testimony was consistent with the [Dictionary of Occupational Titles and that he relied on the [vocational expert's] testimony about [the p]laintiff's ability to perform all of the requirements of the jobs, despite the [plaintiff's residual functional capacity] limitations[.]"  Def.'s Mem. at 10 (emphasis in original) (citation omitted).  However, this argument ignores the ALJ's own explanation of his conclusions in his decision.  As noted above, the ALJ concluded that "the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." App. at 23.  Therefore, the ALJ does not acknowledge any inconsistencies, let alone explain that, to the extent any inconsistencies exist, he reconciled them by "rel[ying] on the [vocational expert's] testimony about [the p]laintiff's ability to perform all of the requirements of the jobs[,]" Def.'s Mem. at 10.  To agree with the defendant's argument would be to either ignore or supplement the ALJ's decision, neither of which the Court may do.  See Espinosa v. Colvin, 953 F. Supp. 2d 25, 32–33 (D.D.C. 2013) ("[I]n reviewing a social security disability

administrative decision, the Court may only consider the grounds proffered by the agency in its decision[,] for post hoc rationalizations do not suffice." (emphasis in original)).

Second, the defendant argues that, even if the ALJ did not resolve the conflict, the vocational expert's "testimony that a claimant is capable of performing work in the national economy is substantial evidence in support of an ALJ's decision if it is in response to a hypothetical question based on an accurate [residual functional capacity]." Def.'s Mem. at 10–11 (citing Callaway v. Berryhill, 292 F. Supp. 3d 289, 298 (D.D.C. 2018)).  Although the defendant is correct that "[a]n ALJ may rely on [vocational expert] testimony to determine whether a claimant's work skills and [residual functional capacity] allow the claimant to perform work in the national economy[,]" Callaway, 292 F. Supp. 3d at 298, this truism does not nullify SSR 00-4p's requirements that "the adjudicator must resolve [any] conflict before relying on the [vocational expert's] evidence to support a determination or decision that the individual is or is not disabled" and must "explain in the determination or decision how he or she resolved the conflict[,]" SSR 00-4p, 2000 WL 1898704, at *4.  Accordingly, the ALJ's failure to provide any explanation in his decision as to how he "resolved the conflict[,]" id., is an error that the Court cannot ignore.

Third and finally, the defendant argues that, "[i]f [the p]laintiff's counsel [at the hearing before the ALJ] was unsatisfied with how [the vocational expert] explained the basis of his opinion that the hypothetical person could perform the identified jobs despite the upper extremity limitations, counsel could have explored this issue with the [vocational expert] at the hearing." Def.'s Mem. at 11 (citation omitted).  The defendant is correct that the plaintiff's former counsel declined to ask the vocational expert any questions during the hearing.  See App. at 72 (noting that, when presented with the opportunity to question the vocational expert, the plaintiff's former

counsel declined to do so).  However, the requirement that "the adjudicator . . . explain in the determination or decision how he or she resolved the conflict" is not contingent on a claimant's identifying a conflict.  SSR 00-4p, 2000 WL 1898704, at *4 ("The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified."); see also Carpenter v. Colvin, No. 13-cv-01637, 2016 WL 946975, at *5 (D.D.C. Feb. 24, 2016) (noting that SSR 00-4p "does not place responsibility for identifying and resolving conflicts between [vocational expert] and [Dictionary of Occupational Titles] evidence on either the [vocational expert] or the parties to the proceeding"); Cox v. Saul, No. 18-cv-02389, 2020 WL 9439356, at *21 (D.D.C. Sept. 1, 2020) (noting the "ALJ's independent duty to identify conflicts").

Accordingly, because the ALJ "made no attempt to address or reconcile the conflict between the [vocational expert's] testimony and the information in the [Dictionary of Occupational Titles,]" Callahan v. Astrue, 786 F. Supp. 2d 87, 95 (D.D.C. 2011), the Court concludes that the ALJ's "decision fails to meet the requirements of SSR 00-4p and must be reversed" and the case remanded to the agency for further proceedings.  Id.

**B.     The Plaintiff's Argument that the ALJ's Determination Regarding Her Mental Residual Functional Capacity Was Not Supported by Substantial Evidence**

Second, the plaintiff argues that "[r]emand is [also] required because the ALJ's [determination of the plaintiff's mental residual functional capacity at step five] was not supported by substantial evidence."  Pl.'s Mem. at 17.  In response, the defendant argues that the ALJ's mental residual functional capacity "finding is supported by substantial evidence" because "the ALJ thoroughly discussed the medical records, explained his weighing of opinion evidence, and discussed his consideration of non-medical evidence in determining [the p]laintiff's mental functional limitations."  Def.'s Mem. at 12 (citation omitted).  The Court will first discuss the ALJ's determination regarding the plaintiff's mental residual functional capacity, and then

proceed to the parties' arguments regarding whether the determination was supported by substantial evidence.  For the following reasons, the Court agrees with the plaintiff.

### 1.  The ALJ's Mental Residual Functional Capacity Determination

In determining the plaintiff's mental residual functional capacity, the ALJ cited the plaintiff's testimony that she "does not spend time with others[,]" id. at 17, "prefers to be alone[,]" id., and "does not need special reminders to care for her personal needs[,]" id. at 19. He also considered the plaintiff's friend's, Sequitta Tolliver's, testimony about the plaintiff's mental state, however, only to the extent that Tolliver's testimony was consistent with the objective medical and other evidence.  See id.

The ALJ also identified notes from the plaintiff's physicians regarding her mental state. See id. at 18 (an October 2014 physical examination of the plaintiff by Dr. Lee Ann Rhodes, whom the plaintiff saw for cervical radiculopathy, which "revealed [her] to be alert and cooperative with a normal mood and affect, a normal attention span[,] [ ] normal concentration[,]" and "no acute distress[,]" as well as "negative for anxiety, memory loss, hallucinations, paranoia, phobia[,] or confusion"); id. at 553, 563 (Dr. Rhodes's April 2015 physical examination of the plaintiff, which "revealed [her] to be oriented with a normal attention span and normal concentration" and at which "Dr. Rhodes noted that [she] required no help with activities of daily living"); id. at 896–97 (a January 2016 physical examination of the plaintiff by Dr. Vanessa McDonald, whom the plaintiff saw for treatment of "symptomatic uterine fibroids[,]" which revealed that she was "alert and oriented to time, place[,] and person with intact recent and remote memory and an appropriate mood and affect").

In addition, the ALJ noted that, despite the plaintiff's hospitalization "for approximately [five] days in August 2012 due to depression and suicidal ideation," she "displayed marked improvement over the course of her admission and there is no evidence she has required further

inpatient hospital confinement for her condition since that time[.]"  Id. at 18.  He also cited his own observations at the hearing, concluding that the plaintiff's "attention and concentration were not so adversely affected by her alleged pain/symptomatology that she was unable to follow the proceedings or respond appropriately to questions."  Id. at 19.

Finally, the ALJ assigned little weight to several pieces of evidence.  First, although Dr. Joel Taubin had concluded in November 2013 that the plaintiff "should not be put into any anxiety[-causing] situations due to psychiatric problems[,]" the ALJ concluded that his opinion should be given little weight because "Dr. Taubin is a consulting examiner[,] [ ] he failed to complete a residual functional capacity assessment of the claimant's ability to perform work-related activities[,]" and his "opinion is inconsistent with the objective evidence discussed" elsewhere in the ALJ's decision.  Id. at 20.  Second, physician assistant Alexandra Scheer had indicated in her February 2016 questionnaire that the plaintiff's "ability to deal with work stress, maintain attention/concentration, [ ] understand, remember[,] and carry out complex job instructions and [ ] relate predictably in social situations was poor[;]" her "ability to function would significantly deteriorate if she was to return to full-time employment[;]" she "would only be able to satisfactorily perform work tasks involving three steps and four steps or more less than [seventy-five percent] of the time[;]" and she "would be unable to work in a setting in which she was working on the same general area as other people[.]"  Id. at 21; see also id. at 902–06. However, the ALJ concluded that Scheer's opinion merited little weight because she "is a non-physician" and "her opinion is inconsistent with the objective findings[,]" including Dr. Rhodes' October 2014 and Dr. McDonald's January 2016 physical examinations.  Id. at 21.  Third, the plaintiff "received Global Assessment of Functioning [ ] scores ranging from 45 to 85[,]" but the ALJ concluded that the "scores of 50 and below are afforded little weight since they are

inconsistent with the objective findings set forth above and the [plaintiff's] course of treatment[,]" including the lack of "evidence [that] the [plaintiff] has required inpatient hospital confinement for her conditions since August 2012[,]" as well Dr. Rhodes' October 2014 and Dr. McDonald's January 2016 physical examinations.  Id.  Finally, the ALJ accepted the state agency medical consultants' determination that "the [plaintiff] . . . retained the residual functional capacity to perform simple, routine tasks on a regular basis without unreasonable accommodations[,]" id.; see also id. at 75–102, but only "to the extent [that] the[ determination was] consistent with the residual functional capacity" determined by the ALJ.  Id. at 22.  The ALJ further noted that "the evidence received into the record after [the state agency medical consultants'] determinations did not provide any new or material information that would alter any findings regarding the [plaintiff's] residual functional capacity."  Id.

In sum, when making his mental residual functional capacity determination, the ALJ only afforded substantial weight to the observations made by Dr. Rhodes and Dr. McDonald during their examinations of the plaintiff, see, e.g., id. at 18, and to the opinions of the state agency medical consultants "to the extent they are consistent with the residual functional capacity" determination that the ALJ had already made,[8] id. at 22.

In addition to the evidence discussed above, the plaintiff had submitted documentation of mental health treatment she received from two psychiatrists, Dr. Nora Bammidi and Dr. Jesselina Grider, and a therapist, Marcia C. Hinkle.  See id. at 809–10 (a February 26, 2014 report from Dr. Bammidi noting that the plaintiff reported hallucinations of a "'shadow' of a man that she

---

[8] The Court notes that the ALJ only accepted the state agency medical consultants' determinations "to the extent they are consistent with the residual functional capacity" determination that the ALJ had already made.  Id. at 22.  In addition to this circular reasoning, the ALJ also provided no information as to which parts of the state agency medical consultants' determinations were inconsistent with his residual functional capacity determination or the reasons for which he discounted those inconsistencies.  See generally id.

sees sitting on the [b]alcony of her room"); id. at 817–18 (an April 14, 2014 report from Dr. Bammidi noting that the plaintiff stated that, "when angry, [she] wants to do things to others" but that, "as she cannot focus [for] too long on certain things, she just forgets"); id. at 830–31 (a May 23, 2014 report from Dr. Bammidi noting that the plaintiff stated that she was "sad and angry, still with nightmares and flashbacks[, and s]leeps during the day[]time [for four to five] hours"); id. at 836–37 (a June 23, 2014 report from Dr. Bammidi, noting that the plaintiff stated that she "[s]till hears voices and asking her to get them"); id. at 832 (a May 21, 2014 report from Hinkle noting that the plaintiff reported hearing voices and "escalating anxiety," resulting in her missing appointments); id. at 834 (a June 11, 2014 report from Hinkle, noting that the plaintiff reported "voices [that] were so loud" that "she felt very angry" and "was using all her energy to contain"); id. at 853–54 (an October 14, 2014 report from Dr. Grider, noting that the plaintiff stated that she "has been having panic attacks that are mild[ e]veryday in the afternoon" and "[s]till hears voices"); id. at 856–57 (an October 30, 2014 report from Dr. Grider, noting that the plaintiff stated that, "[u]nless [she] ha[s doctors'] app[ointments], she remains at home"). However, the ALJ did not say anything about these records as part of his mental residual functional capacity analysis.  See generally id. at 16–22.

### 2. The Plaintiff's Argument

The plaintiff argues that the ALJ's mental residual functional capacity determination is not supported by substantial evidence because the decision "does not discuss any of Dr. Bammidi's, Dr. Grider's, or [ ] Hinkle's treatment notes."  Pl.'s Mem. at 23.  In response, the defendant urges the Court to conclude that a single sentence in the ALJ's decision reflects that he considered the records, but did not assign them any weight.  See Def.'s Mem. at 15 (arguing that "[t]he ALJ specifically addressed [the p]laintiff's complaint that the record contained evidence received after the state agency psychologists' opinions" and "explained that this later evidence

did not provide any new or material information that would alter [the ALJ's residual functional capacity] finding").  For the following reasons, the Court agrees with the plaintiff that the ALJ erred in not specifically explaining his consideration of Dr. Bammidi's, Dr. Grider's, and Hinkle's records.

In his decision, after discussing the state agency medical consultants' determinations, the ALJ states that "the evidence received into the record after [the state agency medical consultants'] determinations did not provide any new or material information that would alter any findings regarding the [plaintiff's] residual functional capacity."  App. at 22.  Contrary to the defendant's argument, this single sentence does not demonstrate that "[t]he ALJ specifically addressed" Dr. Bammidi's, Dr. Grider's, and Hinkle's records.  See Def.'s Mem. at 15.  First, because the ALJ does not specify what evidence was "received into the record after [the state agency medical consultants'] determinations[,]" id., it is far from clear that this evidence includes Dr. Bammidi's, Dr. Grider's, and Hinkle's records.  However, even assuming that Dr. Bammidi's, Dr. Grider's, and Hinkle's records should be considered as part of the ALJ's reference to "evidence received into the record after [the state agency medical consultants'] determinations[,]" id., the ALJ has provided a single, perfunctory sentence with no explanation of the reasons for which Dr. Bammidi's, Dr. Grider's, and Hinkle's records are neither "new" nor "material[,]" id.  Rather, the ALJ's "conclusory remark[] leave[s] the [C]ourt unable to deduce the ALJ's reasons for discounting the [plaintiff's] evidence, thus depriving the [plaintiff] of [ ] meaningful judicial review."  Lane-Rauth, 437 F. Supp. 2d at 68; see also Simms v. Sullivan, 877 F.2d 1047, 1050 (D.C. Cir. 1989) (noting that an ALJ must "sufficiently explain[] the weight he [or she] has given to obviously probative exhibits"); Hartline v. Astrue,

605 F. Supp. 2d 194, 203 (D.D.C. 2009) ("A reviewing court should not be left guessing as to how the ALJ evaluated probative material[.]").

Moreover, the documentation from Dr. Bammidi, Dr. Grider, and Hinkle constitutes evidence that the plaintiff was continuing to complain of mental impairments, including hallucinations, depression, anxiety, a lack of focus, and phobias.  See, e.g., App. at 809–10 (a February 26, 2014 report from Dr. Bammidi noting that the plaintiff reported hallucinations of a "'shadow' of a man that she sees sitting on the [b]alcony of her room"); id. at 832 (a May 21, 2014 report from Hinkle noting that the plaintiff reported hearing voices and "escalating anxiety," resulting in her missing appointments); id. at 853–54 (an October 14, 2014 report from Dr. Grider, noting that the plaintiff stated that she "has been having panic attacks that are mild[ e]veryday in the afternoon" and "[s]till hears voices").  It also contrasts with the evidence on which the ALJ has placed great weight, namely Dr. Rhodes's October 2014 and April 2015 notes about the plaintiff's normal affect and lack of anxiety; Dr. McDonald's January 2016 notes about the plaintiff's normal demeanor; and the state agency medical consultants' January and February 2014 determinations.  See id. at 18–22.  Accordingly, the mental health information provided by the plaintiff is "obviously probative[,]" Simms, 877 F.2d at 1050, regarding the plaintiff's mental functional capacity.  Thus, the ALJ was not free to summarily disregard it.  See Lomax v. Comm'r of Soc. Sec., No. 20-cv-55, 2021 WL 3508087, at *6 (D.D.C. Aug. 4, 2021) ("The ALJ 'must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position.'" (quoting Lane-Rauth, 437 F. Supp. 2d at 67)).

Although the Court is not entitled to "reweigh the evidence and replace the [ALJ's] judgment regarding the weight of the evidence with its own[,]" Price v. Berryhill, No. 16-2469, 2018 WL 4381098, at *4 (D.D.C. Feb. 14, 2018) (internal quotation marks omitted), "it is

reversible error for an ALJ to fail in his written decision to explain sufficiently the weight he has given to certain probative items of evidence[,]" Hartline, 605 F. Supp. 2d at 203.  See id. (noting that "an ALJ cannot merely disregard evidence which does not support his conclusion").  In light of the apparent relevance of Dr. Bammidi's, Dr. Grider's, and Hinkle's mental health evidence regarding the plaintiff's mental conditions, the ALJ's cursory statement that this information was neither "new" nor "material[,]" App. at 22, does not provide a sufficient explanation for rejecting this evidence.[9]

"[W]here the ALJ's decision leaves the reviewing court with reservations as to whether an issue was fully addressed, the court should reverse." Lane-Rauth, 437 F. Supp. 2d at 68 (internal quotation marks omitted).  Accordingly, the Court will also reverse the ALJ's determination as to the plaintiff's mental residual functional capacity, and remand the case to the agency for further proceedings.[10]

---

[9] The defendant also argues that "the record supports that [the ALJ] considered these treatment notes" because (1) "[t]he ALJ relied on . . . [the] determination[ by Dr. Nancy Heiser, a state agency medical consultant], which included consideration of Dr. Bammidi's September 2013 findings[,]" Def.'s Mem. at 18 (citation omitted), and on other "treatment notes that post-date state agency review[,]" id. at 19; (2) the "[p]laintiff's counsel [ ] discussed [ ] Dr. Grider's treatment . . . in his 'Theory of the Case' section of a prehearing memorandum addressed to the ALJ, which the ALJ acknowledged at the hearing[,]" id. at 18 n.7 (citation omitted); (3) "[t]he ALJ referred to Dr. McDonald and [ ] Scheer's notes, which mentioned that Dr. Grider and [ ] Hinkle were treating [the p]laintiff[,]" id. at 19 n.8 (citation omitted); and (4) "the ALJ noted at the hearing that he was waiting for mental health treatment notes before making a decision[,]" id. at 19 (emphasis omitted).

There is no dispute that the records of Dr. Bammidi's, Dr. Grider's, and Hinkle's examinations of the plaintiff were part of the record before the ALJ; rather, the relevant question is whether the ALJ properly explained his consideration of this evidence.  See Hartline, 605 F. Supp. 2d at 203 (noting the ALJ's obligation to provide a sufficient explanation of "the weight he has given to certain probative items of evidence").  Where, as here, the ALJ has not explicitly addressed the treatment notes at issue other than to cursorily dismiss them as immaterial, the Court declines the defendant's invitation to speculate that the ALJ properly considered this evidence because it was part of the record before him.  See Lane-Rauth, 437 F. Supp. 2d at 68 ("[W]here the ALJ's decision leaves the reviewing court with reservations as to whether an issue was fully addressed, the court should reverse.").

[10] The plaintiff also argues that (1) the ALJ erred in relying upon Dr. Heiser's opinion because it was "non-examining" and "stale[,]" and (2) "the only evidence relied upon by the ALJ were stray observations made by physicians who did not even treat [the plaintiff] for her mental health problems." Pl.'s Mem. at 23.  Because the Court is remanding to the agency for further proceedings, the Court will not address at this time these alternative arguments raised by the plaintiff.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the plaintiff's motion for reversal and deny the defendant's motion for affirmance.

**SO ORDERED** this 17th day of December, 2021.[11]

REGGIE B. WALTON
United States District Judge

---

[11] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.